UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN T. GOHRANSON, Individually, and as Personal Representative of the ESTATE OF LINDSAY M. KRONBERGER,<br><br>Plaintiff,<br><br>vs.<br><br>SNOHOMISH COUNTY, a Municipal Corporation in the State of Washington, ROBERT TRENARY; STUART ANDREWS, M.D.; DAN MILLER; ELAINE GRAVATT; GREGORY HARDY; SHERRISE HOLLAND; LAUREN KOOIMAN; JEAN LEIGHT; BETTY LUSK; JOY MAINE; LINET NGETE; ANDREW FLETCHER; RACHELLE ROSE; SHANE STEVIE; ROBIN OTTO; ROXANNE MARLER, AND JOHN AND JANE DOES 1-10; and MAXIM HEALTHCARE SERVICES, INC. d/b/a MAXIM STAFFING SOLUTIONS, a Maryland Corporation, and CASCADE HEALTHCARE SERVICES LLC, a Washington Limited Liability Corporation<br><br>Defendants. | Case No.:<br><br>COMPLAINT<br><br>JURY DEMAND |

COMPLAINT - 1

dg21gm116e

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

COMES NOW, Plaintiff, John T. Gohranson, Individually and as Personal Representative of the Estate of Lindsay M. Kronberger, by and through the undersigned counsel of record, and alleges as follows:

## I. IDENTIFICATION OF THE PARTIES:

1. Plaintiff John T. Gohranson is the husband and duly appointed Personal Representative of the Estate of Lindsay M. Kronberger, deceased. At all relevant times, John Gohranson was a citizen of the United States, and a member of the U.S. Navy stationed in San Diego, California. Mr. Gohranson brings claims individually and as Personal Representative of the Estate of his wife, Lindsay M. Kronberger, deceased, under 42 U.S.C. 1983 and relevant state law.

2. Lindsay M. Kronberger, the decedent, was a 24 year old married woman who died on January 13, 2014, while housed in the medical housing unit of the Snohomish County Jail in Everett, Washington. At all relevant times, Lindsay M. Kronberger was a citizen of the United States, residing in Snohomish County, and as such, was entitled to all rights, privileges or immunities as guaranteed under state law, federal law, and the Washington State and U.S. Constitutions. Her Estate brings claims through her surviving spouse and Personal Representative of her estate, John T. Gohranson.

3. At all relevant times, Defendant Snohomish County, was a municipal corporation organized under the laws and Constitution of the State of Washington, which, by and through its agency, the Snohomish County Sheriff's Office Corrections Bureau, operated, managed, and controlled the Snohomish County Jail (SCJ) and employed, engaged and/or contracted with the remaining defendants. Snohomish County is responsible for the acts and omissions of its agents,

COMPLAINT - 2

**B**REWE **L**AYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

employees, contractors and officials, including those whose conduct gives rise to this cause of action.

4. At all relevant times, Defendant Robert Trenary, who is sued in his official capacity, was the Sheriff of Snohomish County, and was responsible for the Snohomish County Sheriff's Office Corrections Bureau and the SCJ's duty to have policies and procedures in place to protect inmates' constitutional rights to have access to and receive adequate medical care while in custody.

5. At all relevant times, Defendant Stuart Andrews, M.D., was licensed in Washington State as a physician and was employed by and/or under contract with Snohomish County to provide physician and medical director services to Snohomish County for the benefit of inmates of the SCJ. Dr. Andrews duties included, but were not limited to the following: on site consultation; examination of patients and/or chart review; orders for medications, labs, or other treatment for management of medical conditions; evaluation of inmates with chronic or medically complex conditions; consultation by phone with SCJ practitioners to determine need for hospitalization, medication changes, or other treatment for serious medical conditions; reviewing and approving medical policies and clinic protocol, including identifying the need for new protocols; reviewing medical services provided by Nursing staff; and issuing standing orders for medication and treatment. At all relevant times, Dr. Andrews was acting within the course and scope of his employment.

6. At all relevant times, Defendant Dan Miller ("ARNP Miller") was licensed in Washington State as Advanced Registered Nurse Practitioner (ARNP) and employed by and/or contracted with Snohomish County as an ARNP at SCJ, whose duties and responsibilities included

COMPLAINT - 3

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

performing assessments on inmates pursuant to defined protocols, assuring that inmate health care needs are met, and coordinating appropriate follow up care. At all relevant times, ARNP Miller was acting within the course and scope of his employment and/or agency.

7. At all relevant times, Defendants Elaine Gravatt ("LPN Gravatt), Gregory Hardy ("RN Hardy"), Sherrise Holland ("RN Holland"), Jean Leight ("RN Leight"), Lauren Kooiman ("RN Kooiman"), Betty Lusk ("RN  Lusk"), Joy Maine ("RN Maine"), and Linet Ngete ("RN Ngete") were licensed in Washington as Licensed Practical Nurses or Registered Nurses and employed by and/or contracted with Snohomish County as nurses at the SCJ, whose duties and responsibilities included performing nursing assessments pursuant to protocols, assuring that inmate health care needs are met, and coordinating appropriate follow up care.  At all relevant times, they were acting within the course and scope of their employment and/or agency.

8. At all relevant times, Defendant Andrew Fletcher ("Deputy Fletcher"), Defendant Rachelle Rose ("Deputy Rose"), and Defendant Shane Stevie ("Deputy Stevie"), were employed by Snohomish County as Corrections Deputies at the SCJ. Their duties and responsibilities included providing for the custody and care of inmates, including monitoring inmates' mental and physical health.  At all relevant times, Deputies Fletcher, Rose, and Stevie, were acting within the course and scope of their employment.

9. At all relevant times, Defendant Robin Otto ("Sgt. Otto"), and Defendant Roxanne Marler ("Sgt. Marler"), were employed by Snohomish County as Corrections Sergeants at the SCJ. Their duties and responsibilities included providing for the custody and care of inmates, including monitoring inmates' mental and physical health, and supervising corrections deputies while in the

COMPLAINT - 4

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

performance of their duties.  At all relevant times, Sgts. Otto and Marler were acting within the course and scope of their employment.

10. At all relevant times, Defendant Maxim Healthcare Services, Inc., d/b/a Maxim Staffing Solutions ("Maxim") was a Maryland Corporation licensed to do business within the State of Washington.  Defendant Maxim entered into a contract with Snohomish County to provide qualified nurses for supplemental staffing at the SCJ.  At all relevant times, RNs Hardy and Holland were working at SCJ under Maxim's contract with Snohomish County.

11. At all relevant times, Defendant Cascade Healthcare Services, LLC, ("Cascade") was a Washington Limited Liability Corporation licensed to do business within the State of Washington. Defendant Cascade entered into a contract with Snohomish County to provide qualified nurses for supplemental staffing at SCJ.  At all relevant times herein, RNs Gravatt and Ngete were working at SCJ under Cascade's contract with Snohomish County.

**I.      JURISDICTION, VENUE AND STATUTORY COMPLIANCE**:

12. Jurisdiction is proper in Federal Court when an action is brought as a civil rights deprivation of rights claim under the scope of 42 U.S. Code § 1983.

13. Jurisdiction and venue are proper in the U.S. District Court of Western Washington under 28 U.S. Code §1391 as the acts and omissions giving rise to this cause of action occurred in Snohomish County which lies under the judicial jurisdiction of U.S. District Court of Western Washington.

14. Plaintiff John Gohranson served a Notice of Tort Claim on the Snohomish County Risk Management Office on October 29, 2015 pursuant to RCW 4.92 et seq., and more than the required sixty (60) days has passed without resolution of the claim.

COMPLAINT - 5

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

## II. STATEMENT OF CLAIM

**A.    Defendants' Deliberate Indifference to Lindsay Kronberger's Serious Medical Needs.**

15.    On Friday, January 3, 2014, 24 year old Lindsay M. Kronberger (hereinafter referred to as "Lindsay") was arrested and booked at the SJC. At the time of her booking, Lindsay self-reported she was addicted to heroin, and answered "yes" to a question asking if she had withdrawal problems. In the early morning hours of January 13, 2014, Lindsay died in the Medical Housing Unit (MHU). The Snohomish County Medical Examiner determined Lindsay's death was caused by "probable cardiac arrhythmia due [to] dehydration with electrolyte abnormalities due to opiate withdrawal."

16.    When persons addicted to heroin enter a jail, it is common for them to experience withdrawal. Withdrawal from heroin is extremely painful, and can cause cold sweats, depression, anxiety, loss of appetite, unstable moods, muscle cramping, nausea, vomiting, diarrhea, and seizures. Withdrawal itself is rarely fatal, but, if it causes uncontrolled vomiting and diarrhea, then dehydration can result. Dehydration can be fatal. The foreseeable risk of becoming dehydrated during heroin withdrawal is well known in jails.

17.    Dehydration can cause extreme thirst, headaches, dry mouth, weakness, dizziness, confusion, sluggishness, fainting, anxiety, agitation, runny nose, sunken eyes, rapid heartbeat, low blood pressure, cramps, skin discoloration, gooseflesh, and shriveled, dry skin that does not bounce back.

18.    Electrolyte imbalance often accompanies dehydration. Electrolytes are the minerals in bodily fluids that carry an electric charge. Loss of electrolytes can cause muscle rigidity,

COMPLAINT - 6

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

tremors, and changes in mental status and personality. Proper electrolyte balance is vital for normal body function, and electrolyte imbalance can be fatal.

19. When Lindsay was booked in the SCJ on the afternoon of January 3, 2014, RN Maine evaluated her. Lindsay told RN Maine she had problems with withdrawal and had last used heroin that morning. RN Maine determined Lindsay should be housed in the MHU and placed Lindsay on a "detox" watch for heroin withdrawal. RN Maine's handwritten entry on a form entitled "Progress Notes" lists Lindsay's weight as 97 pounds. Right above RN Maine's entry, RN Lisa Powell, wrote: "Note weight of 95 lbs. Appears emaciated – underweight." RN Powell's note was dated one month prior (December 9, 2013).

20. RNs use a preprinted MHU Withdrawal Form to record inmates' vital signs and to record whether an inmate received certain medications (Loperimide, Tylenol, Ibuprofen, or Emetrol). These medications are part of the "standing orders" in place at the SCJ, and nurses can decide, without any consultation with an ARNP or physician, to administer them to inmates. There is also a place to record "Fluids." The preprinted form indicates RNs are supposed to record vitals, fluids, and mediations at 9:00 a.m. and 7:00 p.m. each day – during day shift and swing shift.

21. RNs Hardy and Maine evaluated Lindsay in the MHU on Saturday, January 4, 2014. Both times, Lindsay's blood pressure was low and her heart rate was elevated. On the morning of Sunday, January 5, 2014, Lindsay's blood pressure had fallen to 90/50 and her heart rate was even higher at 144. There is no indication an ARNP was contacted to evaluate and manage Lindsay's continuing hypotensive/tachycardic symptoms. These types of vital signs may represent shock and require medical intervention to prevent serious injury/death. Instead, on

COMPLAINT - 7

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

1  Monday, January 6, 2014, at approximately 7:00 p.m., Lindsay was released from SCJ after she
2  was medically cleared by RN Hardy.

3  22.  Lindsay was only out of custody a short time. She was booked back into the jail
4  around 4:00 a.m. on Tuesday, January 7, 2014. RN Powell evaluated Lindsay in booking.
5  Lindsay's blood pressure remained low and her heartrate was elevated. RN Powell placed Lindsay
6  back on "detox" watch for opiate withdrawal and assigned Lindsay to the MHU again. The Special
7  Watch Log that RN Powell completed at that time contains the handwritten notation "Push Fluids"
8  and appears to indicate Lindsay needs an evaluation. RN Powell did not see Lindsay again until
9  after she was dead.

10  23.  When Lindsay arrived in the MHU approximately three hours later on January 7,
11  2014, RN Hardy was on duty. Despite the fact RN Hardy would have been aware of Lindsay's
12  medical condition from the day before, there is no indication RN Hardy questioned RN Powell
13  about her handwritten notations on the Special Watch Log. There is no indication Lindsay was
14  evaluated by Dr. Andrews or either of the ARNP's on duty on that day. There is no indication
15  anyone engaged in any planning to safely manage Lindsay's withdrawal – despite her earlier
16  hypotension/tachycardia.

17  24.  On the evening of January 7, RN Leight gave Lindsay Emetrol, a medication for
18  nausea, but there are no notations regarding why she was giving Lindsay the medication or how
19  much or often Lindsay reported vomiting. There is no indication RN Leight sought any kind of
20  consultation from an ARNP or administered the medication according to the manufacturer's
21  recommendations.

COMPLAINT - 8

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

25. On Wednesday, January 8, 2014, Lindsay saw RN Hardy again. Lindsay gave RN Hardy a "Medical Services Kite" while RN Hardy assessed Lindsay's vital signs. In the kite, Lindsay wrote "I need anxiety medication. I have been having panic attacks since finding out I'm stuck here until at least Jan. 30th." RN Hardy's notation in Lindsay's Progress Notes states Lindsay said she could not sleep and described her panic attacks as "severe." RN Hardy also gave Lindsay Emetrol, but he also did not note how much Lindsay had been vomiting. Again, there is nothing to indicate RN Hardy administered the medication according to the manufacturer's recommendations. RN Hardy noted a plan to follow up with a physician, but he did not follow up, and Lindsay was not evaluated.

26. There is no indication Dr. Andrews reviewed Lindsay's medical records or evaluated her medical condition in order to provide oversight to the RNs monitoring her.

27. On Thursday, January 9, 2014, RN Holland assessed Lindsay in the morning. RN Holland noted Lindsay's heart rate was elevated at 118. RN Holland did not follow up with Dr. Andrews or contact either ARNP on duty. That evening, RN Ngete assessed Lindsay. RN Ngete noted Lindsay's heartrate had increased to 120, but still did not obtain or seek any further evaluation of Lindsay's medical condition. Both RN Holland and RN Ngete recorded giving Lindsay Emetrol again, but, again, neither RN recorded how much Lindsey was vomiting or charted how they administered the medication. Neither RN Holland nor RN Ngete consulted with Dr. Andrews or an ARNP.

28. On the morning of Friday, January 10, 2014, RN Holland noted Lindsay's blood pressure had dropped to 90/60 but her heart rate remained high at 115. RN Holland continued to give Emetrol without noting how much Lindsay was vomiting or charting how she was

COMPLAINT - 9

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

administering the medication. RN Holland admitted to SCSO Detective Scott Wells that Lindsay's vital signs continued to be abnormal and that Lindsay should have been improving by January 10, 2014. RN Holland did not consult with Dr. Andrews or either ARNP on duty about Lindsay's continuing hypotensive/tachycardia symptoms which indicated Lindsay's condition was deteriorating and becoming emergent.

29. By January 10, 2014, Lindsay had been in the SCJ one week. There is no indication that any nursing supervisor, Dr. Andrews, or ARNP reviewed Lindsay's MHU Withdrawal Form or Progress Notes or consulted with any of the RNs to manage Lindsay's withdrawal.

30. That afternoon/evening, RN Lusk recorded that Lindsay continued to be hypotensive and had "emesis x 2," meaning Lindsay had vomited twice.  RN Lusk was concerned enough about Lindsay's continuing high heart rate that she checked it twice during her shift, and she contacted ARNP Miller to obtain an order for a Phenergan suppository.  Phenergan is an antiemetic to reduce vomiting.  Despite Lindsay's emesis, low blood pressure, and increased pulse – all signs of dehydration – there is no indication ARNP Miller actually evaluated Lindsay before prescribing Phenergan.  RN Lusk gave Lindsay Phenergan at 10:00 p.m.  Despite the fact no physicians or ARNPs would be on duty for the next two days (over the weekend), ARNP Miller did not make any plans for monitoring or follow up after Lindsay received the medication. Lindsay refused the next dose of Phenergan at 2:00 a.m., telling RN Gravatt it gave her loose stools. Diarrhea is another risk factor during opiate withdrawal, but RN Gravatt did not document anything further about Lindsay's condition at the time she refused the medication.  RN Gravatt did not consult with an ARNP regarding Lindsay's changed condition or medication refusal.

COMPLAINT - 10

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

31.     Later in the morning on Saturday, January 11, 2014, RN Kooiman assessed Lindsay in the morning and recorded Lindsay's blood pressure as 80/40 and her heart rate as 65. This low blood pressure suggests shock and is potentially life threatening.  When interviewed by Detective Wells, RN Kooiman said "it was just a real uphill struggle to get a handle on what was going on" with Lindsay.  Despite this difficulty, RN Kooiman did not seek any further evaluation or consultation from Dr. Andrews or an ARNP. The Special Watch Log indicates Lindsay was "checked by nurse" again at 1:30 p.m., but no vitals are recorded on the MHU Withdrawal Form.

32.     At approximately 2:40 p.m. on January 11, 2014, Lindsay was moved from the MHU to the Observation Unit (OU). In her interview with Detective Wells, RN Kooiman indicated that OU was not a good place to house someone who is withdrawing.  RN Kooiman also indicated that Lindsay requested to go to the hospital, but that she (RN Kooiman) did not feel it was necessary. That evening, RN Maine assessed Lindsay.  Although Lindsay's blood pressure had risen, her heart rate remained markedly increased at 110.  The MHU Withdrawal Form indicates RN Maine gave Lindsay Loperimide to control diarrhea. RN Maine did not seek a consultation with Dr. Andrews or ARNP Miller to report Lindsay's refusal to take the previously prescribed Phenergan (because it caused her to have diarrhea) and the change to Loperimide.

33.     The next day, Sunday, January 12, 2014, was Lindsay's last day alive.  That morning RN Kooiman noted Lindsay's blood pressure was low and heart rate was still elevated – continuing signs of dehydration. In her interview with Detective Wells, RN Kooiman admitted she felt Lindsay was a high risk inmate because of her slight build/low weight and was unsure about how much Lindsay had been drinking or her frequency of vomiting.  Despite all of these comments, RN Kooiman did not weigh Lindsay or take any action to evaluate her for dehydration.

COMPLAINT - 11

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

34. RN Maine took over Lindsay's care from RN Kooiman in the OU. Deputy Stevie was on duty in the OU, and stated that Lindsay was housed alone because she was so sick. Deputy Stevie observed several biohazard bags outside and inside her cell filled with vomit. Deputy Stevie noted that Lindsay's voice was weak, her attention span was short, and she could only sit up for a short period of time. Deputy Stevie did not bring his observations to the attention of RN Maine.

35. At 5:10 p.m., Lindsay was moved back to the MHU. She asked for a wheelchair to go from the OU to the MHU, but Deputy Rose and Deputy Stevie told her no. Deputy Rose noted Lindsay was "conscious but seemed to have a blank expression." When Lindsay stood in her cell in OU, Deputy Rose began to pat her down, but Lindsay's legs went weak and she started to fall to the ground. Deputy Rose and Sgt. Otto lifted her up and, each on one side supporting Lindsay under her arms, half carried, half dragged her to the MHU. Sgt. Otto had to hold Lindsay up while Deputy Rose searched her again inside her cell at MHU, and then they laid Lindsay down on her mattress.

36. RN Maine was at the nurses' station in MHU and watched Deputy Rose and Sgt. Otto put Lindsay in her cell. RN Maine did not bother to assess Lindsay at that time despite the fact that weakness and/or dizziness is another clear sign of dehydration. Sgt. Otto later told Detective Wells that RN Maine said she had "just seen" Lindsay in the OU, had poured her some juice, and that she was standing up. In reality, RN Maine saw Lindsay at 2:30 p.m. – almost three (3) hours earlier.

37. At 7:00 p.m. Deputy Fletcher reports Lindsay started to pass out as she was trying to get some juice. He called for assistance. Sgt. Marler and Deputy Rose report they assisted Lindsay back into her bed. RN Maine reports she assessed Lindsay and her vitals were "stable and improving from her previously recorded vital signs." This is not accurate. According to the MHU

COMPLAINT - 12

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

1  Withdrawal Form, Lindsay's vital signs were the same as earlier in the day – her blood pressure
2  was still low and her heart rate was still high.

3      38.    Sometime shortly after 8:15 p.m. Deputy Fletcher reports Lindsay asked for juice,
4  and he told her to come out of her cell and get it.  He stated he does this so he can assess an
5  inmate's condition.  Lindsay walked to the juice cart and then her legs gave out and she grabbed
6  the cart.  Deputy Fletcher reports he grabbed Lindsay's arm and called for backup.  Deputy
7  Fletcher states Sgt. Marler arrived and helped place Lindsay back into bed.  Sgt. Marler's report
8  states that she arrived in the MHU and saw Lindsay lying on the floor of her cell next to her bed
9  wearing her jail uniform top and "her sheet around her waist and legs."  Sgt. Marler also states she
10 moved Lindsay's bed closer to the toilet so "she didn't have to try to get up out of bed and walk to
11 it, she could just pull herself up on it."  Neither Deputy Fletcher nor Sgt. Marler notified RN Maine
12 regarding this incident.

13     39.    Deputy Fletcher next reports he spoke with Lindsay sometime between 9:30 p.m.
14 and 10:00 p.m. because she moved her bed closer to the door. RN Maine reports she last observed
15 Lindsay sleeping in her bed around 9:30 p.m. She did not reassess Lindsay's vital signs before
16 leaving the MHU and returning to the clinic at the end of her shift.

17     40.    Deputy Fletcher reported he checked Lindsay every half hour and "nothing
18 significant" happened before he left SCJ at the end of his shift at midnight.

19     41.    Corrections Deputy Scott Maxey took over from Deputy Fletcher.  Deputy Maxey
20 reports he looked inside Lindsay's cell at 12:03 a.m. and she was lying on her side with no blankets
21 covering her.  Thirty minutes later, Lindsay was lying on her side with a blanket covering her legs.
22 The next time Deputy Maxey looked in Lindsay's cell, she was face down in the toilet.

COMPLAINT - 13

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

42. Deputy Maxey called a medical emergency, and entered her cell. Additional Corrections Deputies arrived and moved Lindsay from the toilet to her bed and then out into the hall. Efforts to resuscitate Lindsay failed, and she died without ever regaining consciousness.

43. As part of her autopsy, Lindsay was weighed. She weighed 89 pounds. Lindsay had lost 8 pounds over the 9 days she was in SCJ.

44. SCJ surveillance video exists showing Lindsay in the MHU on January 12, 2014 between 5:00 p.m. and her death approximately 7.5 hours later. Surveillance video prior to January 12, 2014, was not preserved by the SCJ despite Plaintiff's request, two days after Lindsay died, that SCJ preserve all video showing Lindsay anywhere in the SCJ between January 3 and January 13, 2014. SCJ has no explanation for its failure to preserve video, and simply told Plaintiff the video was either recorded over or may not have ever been recorded in the first place.

45. The surveillance video that does exist reveals Defendants' deliberate indifference to Lindsay's deteriorating condition. Surveillance video shows Deputy Rose and Sgt. Otto dragging/carrying Lindsay into the MHU. Deputy Rose kicks Lindsay's "bin box" containing her belongings down the hall from OU to MHU. Deputy Fletcher and Sgt. Marler laugh and joke about Lindsay's condition. Deputy Fletcher mimics Lindsay sliding to the ground, and Sgt. Marler laughs and responds with exaggerated hand movements feigning Lindsay's level of distress. Sgt. Otto observes Deputy Fletcher dancing outside of Lindsay's cell. Deputy Fletcher repeatedly "knuckle bumps" other corrections personnel. Additionally, the surveillance video is not consistent with the later written reports and records from Deputy Fletcher, Sgt. Marler, Deputy Rose and RN Maine.

COMPLAINT - 14

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

**B.     SCJ's Policies, Practices, Customs and Systemic Deficiencies.**

46.     By January 3, 2014, the SCJ had come under increasing scrutiny because of the unusually high number of deaths within the jail.  By that date, nine (9) people had died since 2010 while incarcerated at SCJ.

47.     SCJ was well aware of the problems it had with its medical unit.  In July 2013, SCJ sought advice from the Pierce County Sheriff's Office, which operates the Pierce County Jail.  In seeking that advice SCJ acknowledged concerns regarding the competency of some of the contract/agency nurses from Maxim and Cascade.  Pierce County assessed the SCJ's medical unit.  Pierce County did not make any written findings regarding their review because of concerns regarding public disclosure requests.

48.     In August 2013, Pierce County officials met with Sheriff Trenary and other administrative officials in the Snohomish County Sheriff's Office and the Corrections Bureau/SCJ.  In response to a public disclosure request to Snohomish County, Plaintiff received written minutes from the meeting.  Those minutes indicate that Pierce County officials warned Snohomish County, in part, that

> [t]he "Agency" nurses are not the best types of people in relationship to regular staff members.  Most "Agency" staff just wants (working hours); they are not invested in an institution's programs or (best) care practices.  "Agency" staff is an "in/out" staff that doesn't really care what's happening.  This type of attitude and work ethic actually hurts the morale of regular jail staff.
>
> [SCJ] definitely has a lack of staff which equates to "delay's and denials" of care which is both harmful to the patient and the organization.
>
> [SCJ] needs better documentation/forms for charting purposes.  There is a high level of vulnerability in this area for the jail.  [SCJ's] current charting practices are not protecting [SCJ]/.  While [SCJ's] protocol is good, there is no proper and/or accurate and complete documentation.  This is difficult to defend with lawsuits.'

COMPLAINT - 15

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

> One major overall concern…is that [SCJ] should have more "clinician" (physician) review, direction and assistance. The lack of leadership from a clinician (physician) is a prominent factor in [SCJ's] mortalities. The RNs need better/more training.
>
> Typically, in a well functioning organization, there are cross-checks between Custody staff/medical staff/mental health staff. Each role contributes as an active participant in the care and well-being of the patient. Therefore, training is crucial. Access to medical care for the inmate is essential.
>
> There are no intervention efforts being undertaken or conducted. A common fallback to accommodate shortfalls for staffing and care is that the inmate is tagged as "feigning" their need for care. This then becomes part of the "culture" as is the case for [SCJ].

49. In September 2013, the United States Department of Justice National Institute of Corrections (NIC) conducted an assessment of SCJ's medical, mental health, and suicide prevention policies and practices. The report summarizing the NIC's assessment was released to the public in November 2013. The report confirmed that there were systemic and gross deficiencies in SCJ's staffing, facilities, equipment, procedures, and policies (or lack thereof). The NIC assessment concluded "inadequate health care staffing levels, unqualified intake health screens, absence of clear and formal policies and procedures, and a lack of a functional records system make timely and consistent access to appropriate health care virtually impossible."

50. Citing the high mortality risks associated with alcohol and opioid withdrawal complications, the NIC report recommended SCJ "develop and implement evidence-based withdrawal intervention and treatment policies." In a response from SCJ pursuant to a public disclosure request, SCJ stated it did not have specific withdrawal policies in place in January 2014 and "inmates having opiate withdrawal symptoms were managed individually by the ARNPs in the medical clinic."

COMPLAINT - 16

BREWE LAYMAN P.S.
Attorneys at Law

P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

51. SCJ's training and policies, if any, were wholly inadequate to meet the needs of any inmate suffering from withdrawal. Despite clear notice from both Pierce County and the NIC regarding dangerous medical deficiencies in the jail, SCJ continued on with its culture of indifference towards the medical needs of its inmates. RNs and Corrections personnel ignored Lindsay's deteriorating condition, failed to consult with more experienced medical staff (ARNP or physician), and failed to transfer her medical care to a hospital despite clear signs of imminent peril over the last few days of her life.

### III. FIRST CAUSE OF ACTION: SECTION 1983 CIVIL RIGHTS VIOLATION 4th, 8th and 14th AMENDMENT RIGHTS

52. Jail inmates have the constitutional right to be free from unreasonable seizures and to have access to and receive adequate health care. Prisoners are entitled to rights under the Fourth and Eighth Amendment of the United States Constitution, while the rights of pre-trial detainees derive from the Due Process Clause of the Fourteenth Amendment.

53. By virtue of the facts set forth above, Defendant Snohomish County, its agents and employees, and the individual Defendants herein, interfered with, obstructed, and otherwise deprived Lindsay of her constitutionally protected Civil Rights, including, but not limited to, the violation of Lindsay's right to due process and equal protection of the laws protecting those similarly situated as her, including her liberty interests and protection of her life; the violation of Lindsay's right against cruel and unusual punishment and unreasonable searches and seizures as set forth in the Fourth and Eighth Amendments to the United States Constitution; the violation of the special relationship created by Lindsay's incarceration at the Snohomish County Jail; and for the deliberate indifference of Defendants to Lindsay's right to reasonable, effective, and prompt

COMPLAINT - 17

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

medical care and treatment. Defendant Snohomish County, and the enumerated individual Defendants, acted under color of law with deliberate indifference to Lindsay's constitutional rights to equal protection of the law, adequate medical care, and the avoidance of cruel and unusual punishment, as set forth herein, all in violation of 42 USC 1983. As a direct and proximate result of the Defendants' violation of Lindsay's constitutional rights, she experienced substantial pre-death pain, suffering, terror, anxiety, and eventual death.

54. By virtue of the facts set forth above, Defendant Snohomish County was aware of the inadequate medical care it was providing to its inmates and failed to adequately train and/or supervise its personnel with regard to the conduct described herein. Defendant Snohomish County deprived Lindsay of her civil rights and her entitlement to equal protection of the law via its lack of training, policies, and procedures, which have directly led to multiple deaths at the Snohomish County Jail, including but not limited to deliberate indifference, lack of proper observation, lack of medical screening, and lack of reasonable medical treatment, all in violation of 42 USC 1983. As a direct and proximate result of Defendant Snohomish County's violation of Lindsay's constitutional rights, she experienced substantial pre-death pain, suffering, terror, anxiety, and eventual death.

### IV.   SECOND CAUSE OF ACTION – NEGLIGENCE

55. By virtue of the facts set forth above, Defendant Snohomish County, and Defendants Miller, Gravatt, Holland, Leight, Kooiman, Lusk, Maine, and Ngete owed Lindsay a duty of reasonable medical care during her incarceration at SCJ. Said Defendants breached their duty, and treated Lindsay negligently and below the standard of care to which each is held. As a direct and proximate result of their negligent conduct, Lindsay experienced substantial pre-death pain, suffering, terror, anxiety, and eventual death.

COMPLAINT - 18

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

## V.     THIRD CAUSE OF ACTION – OUTRAGE

56.     By virtue of the facts set forth above, Defendant Snohomish County is liable to the Plaintiff for the tort of outrage because of the extreme and outrageous actions of Defendants Fletcher and Marler towards Lindsay while she was in custody in the MHU. Lindsay was medically fragile, vulnerable, and completely under their power and control. They stood just outside her cell mimicking and mocking her as she lay on her bed suffering needlessly, causing Plaintiff to suffer severe emotional distress.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

1. Compensatory damages, including economic and noneconomic damages, damages for pain, suffering, and terror pursuant to 42 U.S.C. 1983, in an amount to be proven at trial;
2. Compensatory damages, including general and special damages, as may be available under Washington State law, in an amount to be proven at trial;
3. Costs, including reasonable attorneys' fees, and costs pursuant to 42 U.S.C. 1988 and to the extent available under the law;
4. Punitive damages against the individual, non-municipal defendants to the extent authorized by law in an amount to be proven at trial;
5. Declaration that the defendants are jointly and severally liable;
6. Award of any and all applicable interest on the judgment;
7. In addition to economic damages, plaintiff seeks alternative forms of relief pursuant to FRCP 8(a)(3) in the form of changes to medical policy, protocol and procedures at the

COMPLAINT - 19

BREWE LAYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com

dg21gm116e

Snohomish County Jail that would reduce the risk of unnecessary and preventable deaths due to incompetent medical care; and

8. Any and all other such further relief as the Court deems just and equitable.

## VII.  DEMAND FOR JURY TRIAL

Pursuant to FRCP 38(b), Plaintiffs hereby demand a jury for all issues triable.

Dated this _____ day of July, 2016.

s/  Karen D. Moore
s/  Kenneth E. Brewe
Karen D. Moore, WSBA #21328
Kenneth E. Brewe, WSBA #9220
Brewe Layman, P.S.
3525 Colby Avenue
Everett, Washington  98201
Telephone:  (425) 252-5167
Facsimile:  (425) 252-9055
Email:  Karenm@brewelaw.com
Email:  Kennethb@brewelaw.com

s/ Todd C. Nichols
s/ W. Mitchell Cogdill
Todd C. Nichols, WSBA #15366
W. Mitchell Cogdill, WSBA #1950
Cogdill Nichols Rein Wartelle Andrews
3232 Rockefeller Avenue
Everett, Washington  98201
Telephone:  (425) 259-6111
Facsimile:  (425) 259-6435
Email:  toddn@cnrlaw.com
Email:  wmc@cnrlaw.com

COMPLAINT - 20

dg21gm116e

**B**REWE **L**AYMAN P.S.
Attorneys at Law
P.O. Box 488
Everett, Washington 98206-0488
(425) 252-5167 Phone
(425) 252-9055 Fax
www.brewelaw.com